# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
THE FOLLOWING LOCATION:

No.  19-mj-219-01-AJ

The Body of Luis Carpio

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Kyle A. Kassa, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I am a 2004 graduate of the Maine Criminal Justice Academy's 7th Basic Law

Enforcement Program and am employed as a Deputy Sheriff with the York County Sheriff's

Office (Maine), and have been since November of 2005. Prior to that I was employed as a

Patrolman with the Buxton Police Department.  I am currently a Task Force Officer (TFO)

assigned full time to the Federal Bureau of Investigation's Safe Streets Gang Task Force.

2.       In the course of my law enforcement training and experience, I have had an

opportunity to search for, seize, and personally observe what I have recognized to be and what

was later confirmed by drug analysis to be schedule drugs, including but not limited to heroin,

fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and

various narcotics lawfully available only by prescription.  I have conducted or participated in,

among other things, surveillance, undercover transactions, debriefings of informants and

confidential sources, and reviews of taped conversations relating to narcotics trafficking.  I have

assisted in many other investigations, both state and federal, to include investigations of crimes

of violence. I have drafted numerous search and arrest warrants and have assisted in the

execution of numerous search and arrest warrants.

3.      I make this Affidavit in support of an application for a search warrant for the Person to be Searched described in Paragraph 5.  I submit that probable cause exists to believe that violations of 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 924(c) (possession of a firearm during and in relation to a crime of violence) have been committed and that evidence of these offenses described in more detail below, is present in the Person to be Searched.

4.      This evidence is seizable pursuant to Federal Rule of Criminal Procedure 41 as evidence of the commission of the criminal offense.  I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of FBI and other law enforcement agencies, and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer, or witness with knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

5.      Luis Carpio is a 30-year-old Hispanic male with brown hair and brown eyes. He is approximately 6 feet, 3 inches tall and weighs approximately 165 pounds.  Carpio is currently incarcerated at the New Hampshire State Prison for Men in Concord, New Hampshire.

6.      I respectfully submit this Affidavit in support of a search warrant to obtain samples of buccal cells from inside the mouth of Luis Carpio.  The purpose of obtaining the buccal cells is so that deoxyribonucleic acid (DNA) profiles may be compared to DNA profiles identified on evidence items identified in Paragraph 21 of this affidavit, collected from the premises of _____ in York, Maine on August 3, 2019.

7.      I have learned from training and experience that obtaining a sample of one's buccal cells and testing them is an effective method for determining that person's DNA profile. I have obtained DNA test kits, each containing a sponge foam collection device for the purpose of collecting these samples. The collection device is placed in the subject's mouth along the subject's gum-line, at the fold line of the cheek, and under the tongue. The sample collection process takes approximately fifteen seconds after rubbing the foam tip on the inside of the cheek. The collection sample is then pressed on a collection card and sealed in a multi-barrier collection pouch. The collection process will be carried out by a law enforcement officer, and the process is sterile and safe for both the donor and the collector.

8.      After obtaining buccal cells from Luis Carpio, I intend to request that the FBI Crime Lab in Quantico, Virginia perform an analyses to determine if DNA collected from the premises of _____ in York, Maine, further described in Paragraph 21, belongs to Luis Carpio.

**Showing of Probable Cause**

9.      In the early morning hours of August 3, 2019, the York Police Department (Maine) received an emergency 911 call reporting a shooting at _____ York, Maine.

10.     When officers arrived, they encountered a male (later determined to be the homeowner) and two females in the garage area of the residence. The homeowner had been shot in the abdomen.

11.     Law enforcement personnel were able to interview one of the females who stated that she had travelled to the residence with the homeowner and the homeowner's girlfriend. She indicated they had been out that evening and then returned to the residence in the same vehicle. She indicated that that they backed into the garage and the garage door started to close but then

the door was re-opened. Two masked men entered the garage. One of the men became engaged in a physical altercation with the homeowner outside the vehicle. She went to assist the homeowner and as she was engaged in the altercation between the two men she heard a gunshot and saw that the homeowner had been shot in the abdominal area. The masked men then fled.

12.    The homeowner had video and audio surveillance equipment installed at ▓▓▓▓ ▓▓▓▓ In the course of investigating the incident, I viewed surveillance footage and noted that at approximately 12:26 A.M., two individuals slowly approach and enter the driveway. Both individuals appear masked and wearing gloves; one individual is carrying a backpack. Ten minutes later, the vehicle carrying the homeowner arrives at the home. Shortly after the vehicle arrives, a struggle is heard, followed by a single gunshot. At 12:38 A.M., both individuals flee down the driveway. One individual appears to be carrying a handgun, and neither person was wearing a backpack.

13.    The homeowner has told police that he is in the business of distributing marijuana.

14.    Following the robbery/shooting, the victim's girlfriend was interviewed by law enforcement and the girlfriend indicated that she had an opportunity to observe the robber's skin. Based on the observed skin tone, the girlfriend believed that the suspect was possibly Hispanic.

15.    Seven minutes after the 911 call reporting the robbery/shooting at ▓▓▓▓ ▓▓▓ on August 3, 2019, a York Police Department officer responding to the residence pulled over and staged on ▓▓▓▓ in order to await the arrival of additional officers before proceeding to the residence. ▓▓▓▓ leads to ▓▓▓▓▓ and is not a heavily traveled roadway, particularly at that time of night.

16.     The York Police Department cruiser was equipped with a mobile license plate reader (LPR) which logs the registration plates of passing vehicles. At 12:46 A.M., the LPR affixed to the police cruiser logged a passing registration plate of New Hampshire ⬚⬚⬚⬚⬚

17.     Investigators determined that the registration plate was affixed to a Nissan Rogue, registered to Luis M. Carpio (hereinafter "Carpio") of Manchester, New Hampshire.

18.     During the early morning hours of August 3, 2019, investigators requested that officers with the Manchester Police Department make contact with the owner of the vehicle to ascertain the reason the vehicle was on ⬚⬚⬚⬚⬚ in York near the time of the incident. Officers responded to Carpio's residence and determined the vehicle was not present.

19.     I later obtained a criminal history maintained by the Manchester Police Department, which indicated they had arrested Carpio on several occasions; specifically on December 22, 2013 for two counts of armed robbery. The criminal history indicated that Carpio was convicted. This criminal history sheet indicated Carpio's phone number is ⬚⬚⬚⬚⬚ (hereinafter "Carpio Phone").

20.     Through the subpoena process, I obtained subscriber information and toll records for the Carpio Phone.  These records show that Sprint is the provider of Carpio Phone and that the listed subscriber is ⬚⬚⬚⬚⬚ of ⬚⬚⬚⬚⬚ in Manchester, NH. A law enforcement database indicated that ⬚⬚⬚⬚⬚ was Carpio's girlfriend at one time and he has a previous address at the same address. A review of call activity for the Carpio Phone reveals that the Carpio Phone was very active during the late night hours of August 2, 2019 and the early morning hours of August 3, 2019; however there was no outgoing phone activity between 12:19 A.M. and 1:12 A.M., the timeframe of the shooting/attempted robbery at ⬚⬚⬚⬚⬚

21.     On August 3, 2019, I obtained a search warrant for the premises of _____ _____ to collect physical evidence associated with the shooting. The FBI Evidence Response Team responded to process the crime scene. During the subsequent search, investigators discovered a backpack believed to have been left by the suspects; the contents of the backpack indicated a likely robbery. The backpack contained one roll of duct tape, eleven plastic zip ties, and three white plastic bags. The Evidence Response Team also collected other items of evidence, including but not limited to, DNA swabs of suspected blood droplets, a spent .45 caliber shell casing, a loaded .32 caliber handgun magazine, numerous discarded latex gloves, safety glasses, and gum. Based on my training and experience, I know that DNA evidence can be easily transferred from a person to an object that person touches and therefore these evidence exhibits have the potential to contain DNA profiles. These items were collected and sent to the FBI laboratory in Quantico, Virginia for laboratory examination, including DNA analysis.

22.     On August 20, 2019, I interviewed Luis Carpio at his residence in Manchester, New Hampshire. I explained to Carpio that law enforcement detected his vehicle being in the vicinity of the incident being investigated, and the purpose of the interview was to determine if Carpio was a witness to the incident and may have pertinent information and to ascertain the reason for his presence in the area.  At the time of this interview, Carpio's Nissan Rogue, with New Hampshire registration _____ was parked in front of Carpio's residence.

23.     Carpio was unable to provide any reason that his vehicle was in that vicinity on the early morning hours of August 3, 2019. Carpio stated he did not know anyone in York, Maine. Carpio appeared deep in thought, and in sum and in substance, stated that he had not been to the State of Maine in years. Carpio further denied being in the York, Maine area or any of the coastal Maine towns during the early morning hours of August 3, 2019.

24.     Carpio stated that he lent his vehicle to a friend, who he did not immediately identify, over the weekend of August 3rd however not during the timeframe of the robbery. Carpio denied that anyone else had the vehicle over the weekend, and that he had left the keys in the vehicle after making arrangements with his friend to pick up the vehicle at Carpio's place of employment in Manchester, New Hampshire on the afternoon of August 3rd. Carpio stated that no one has free access to take his vehicle without his knowledge and none of his friends would steal it.

25.     Carpio stated that he had lent the vehicle to Jason Santiago and provided a phone number for Santiago as [          ]. Santiago was reportedly living at the corner of [          ] in Manchester, New Hampshire, and in response to a question indicated to me that Santiago had a criminal history. Carpio stated that he had been at his place of employment during the week before and had left his vehicle for Santiago to "scoop up" at his place of employment at 3:00 on Saturday August 3rd. I inquired if his vehicle was picked up at 3:00 A.M. or P.M., and Carpio clarified "in the afternoon." I pointed out that by that time he lent Santiago his vehicle, the vehicle had already been documented at the scene of the incident.

26.     On September 19, 2019, law enforcement personnel interviewed a witness (hereinafter "WITNESS") who stated the following:

a)     [          ]

b)     WITNESS identified Carpio's phone number as the same number as the "Carpio Phone" and believed that Carpio had his phone on August 2, 2019 – August 3, 2019.

c)     On the night of the robbery, Carpio lent a vehicle to an individual the WITNESS knew as "Candy."

d)      WITNESS claimed not to know Candy's real name, but identified him as a dark skin male with tattoos on his back.

e)      WITNESS was present when Candy arrived to borrow the vehicle. WITNESS estimated that Candy picked up the vehicle around 9:00 P.M. – 10:00 P.M.

f)      WITNESS fell asleep after 11:00 P.M - 11:30 P.M. Carpio was present when WITNESS fell asleep but WITNESS had no interaction with Carpio overnight until the following morning. Carpio was present when WITNESS woke up.

g)      At approximately 6:00 A.M. the following morning, WITNESS woke up and went to the store.  The vehicle was present at the apartment, however Candy was not. WITNESS entered the vehicle and noticed that the vehicle was in disarray; specifically there was mud all over the interior of the vehicle, there was a large black duffel bag in the back, as well as masks and white plastic zip ties. Following the discovery, WITNESS brought the vehicle to a car wash and cleaned the interior because WITNESS didn't want to be involved in whatever happened. WITNESS placed all the suspicious items together in the bag, placed it in the trunk of the vehicle and later discarded them in a dumpster.

h)      On August 30, 2019, Candy contacted and interacted with Carpio over Carpio's Facebook account. Candy reportedly asked Carpio over Facebook to have WITNESS contact him because Candy wanted to know what WITNESS did with the items inside the vehicle. Carpio told Candy that WITNESS threw it all away. Carpio gave WITNESS Candy's new phone new phone number and WITNESS sent Candy a text message shortly before her arrest.

i)      WITNESS overheard the "whole story" of the robbery between Candy and Carpio. WITNESS overheard Candy talking about a male who lives far away in a beautiful house being shot in the shoulder, a screaming female, a garage, and Candy and another male she knows

as "Sobo" [1] running through the woods. (Note: these specific details closely align with how the actual events of the incident occurred).

27.     As part of this investigation, I obtained cell site location data for the Carpio Phone. A preliminary analysis of the location data indicated that the Carpio Phone traveled to York/Kittery Maine and was interfacing with cellular towers servicing the ▓▓▓▓▓▓▓ York area at approximately 12:09 AM on August 2, 2019 and remained in the area until approximately 3:30 A.M.- 4:00 A.M. The device then left the State of Maine and began traveling in the area of Route 101 towards Manchester, New Hampshire.

28.     Officers with the Manchester Police Department are familiar with WITNESS and they believe WITNESS knows "Candy", and in fact Candy may be a co-conspirator in criminal conduct in which WITNESS engaged. Investigating officers believe that "Candy's" true name is Jason Candelario, and has documented ties to Manchester, New Hampshire.

29.     I spoke with an investigator with the Canton, Massachusetts Police Department. The investigator provided me reports from the Canton Police Department detailing an armed home invasion robbery that happened during the early morning hours of July 20, 2019 in Canton, Massachusetts. Three individuals entered the victim's residence in the middle of the night and restrained the victim with zip ties, threatened him with a firearm, and stole property including among other things, an estimated $17,000 in CBD products. Investigators subsequently arrested two of the suspects. Video of this incident was sent to investigators in Manchester and the investigators identified Jason Candelario, a/k/a "Candy", as one of the perpetrators. The

---

[1]Based upon my investigation to date, I believe "Sobo" is Andrew Soboleski of Manchester, New Hampshire. The Candy Phone had extensive telephone connectivity with a phone believed to be used by Soboleski during the timeframe of the shooting at ▓▓▓▓▓▓▓▓▓ on August 3, 2019.

investigators are familiar with Candelario because they have had numerous encounters with Candelario.

30.     I learned that Jason Candelario is indexed in Manchester Police Department records with the phone number ▒▒▒▒▒▒▒ (hereinafter "Candelario Phone"). Investigators with the Canton Police Department obtained a job application submitted by Candelario to his former employer in February of 2019. The application indicated that Candelario's phone number was ▒▒▒▒▒▒▒ Finally, I spoke with Candelario's probation officer who indicated that he spoke with Candelario at the phone number ▒▒▒▒▒▒▒ on the morning of August 8, 2019.

31.     As part of this investigation, through court process I obtained historical cell site location for the Candelario Phone. Data subsequently provided by the cellular phone carrier indicates that the Candelario phone traveled from Manchester, New Hampshire on the night of August 2, 2019 and was interfacing with cellular towers servicing the ▒▒▒▒▒▒▒, York area during the early morning shooting on August 3, 2019. Similarly to the Carpio Phone, the Candelario phone remained in the area following the shooting, and eventually returned to Manchester, New Hampshire in the early morning hours of August 3, 2019.

32.     On October 15, 2019, I spoke with a FBI physical scientist assigned to examine evidence seized from ▒▒▒▒▒▒▒ in York, Maine on August 3, 2019. I learned that an examination of the evidence was in progress and there were apparently DNA profile/s present.

33.     On October 23, 2019 I queried the FBI's Federal DNA Database Unit (FDDU), to determine if a DNA profile of Luis Carpio existed in the database in order to compare with any profiles determined to be present on evidence collected from ▒▒▒▒▒▒▒ I learned that Carpio's DNA profile had not been entered into the database.

34.     Based on the information detailed above in this Affidavit, there is probable cause

to believe that violations of 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 924(c) (possession of a firearm during and in relation to a crime of violence) have occurred, and that evidence of those violations are likely to be found on the person of Luis Carpio. I therefore respectfully request that a search warrant be issued for the person of Luis Carpio authorizing seizure of buccal cells from the inside of Carpio's cheeks.

/s/ Kyle Kassa
Kyle Kassa
Task Force Officer, FBI

Sworn to before me this 1st day of November, 2019.

/s/ Andrea K. Johnstone
Andrea K. Johnstone
United States Magistrate Judge